47

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**MARK W. DOBRONSKI,**
an individual,

                    Plaintiff,

v.

**ANTHONY J. RUSSO, JR., P.A.,**
a Florida corporation,
d/b/a **THE RUSSO FIRM,**

**ANTHONY JOHN RUSSO, JR.,**
an individual,
d/b/a **RP LAW LLC,**

**MATTHEW A. DOLMAN, P.A.,**
a Florida corporation,
d/b/a **DOLMAN LAW GROUP,**

**TORHOERMAN LAW LLC,**
an Illinois limited liability company,

**SADDLE ROCK LEGAL GROUP LLC,**
an Arizona limited liability company,

**THOMAS LOWE YOUNG,**
an individual,

**TYLER JOSEPH SCHNEIDER,**
an individual, and,

**CONSUMER ENROLLMENTS CENTER,**
a non-registered fictional business name,

                  Defendants.

Case: 2:23-cv-12288
Assigned To : Cox, Sean F.
Referral Judge: Altman, Kimberly G.
Assign. Date : 9/7/2023 12:08 PM
Description: CMP DOBRONSKI V. RUSSO ET AL (DA)

**COMPLAINT**

NOW COMES the Plaintiff, MARK W. DOBRONSKI, appearing *in propria persona*, and for his complaint against Defendants alleges:

1.  This matter arises under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, *et seq.*, and the Florida Telemarketing Sales Act ("FTSA"), Fla. Stat. § 501.059.

## Parties

2.  Plaintiff is an individual, of the age of majority, a citizen of the United States of America, is a resident of and has a place of business in Orange County, Florida, has a residence and place of business in Washtenaw County, Michigan, and has a place of business in Wayne County, Michigan.

3. Defendant ANTHONY J. RUSSO, JR., P.A. ("Russo Firm"), is a corporation organized and existing under the laws of the State of Florida, that does business under the fictitious business name of THE RUSSO FIRM, with its principal place of business located at 301 West Atlantic Avenue, Suite O2, Delray Beach, Florida 33444-3686.

4.  Defendant ANTHONY JOHN RUSSO, JR. ("Russo"), is an individual, of the age of majority, is mentally competent, is not in the military service, and resides at 411 North New River Drive East, Apartment 3902, Fort Lauderdale, Florida 33301-3184, and does business under the fictitious business name RP LAW LLC

2

("RP Law").

5. Although the business name RP LAW LLC gives the impression of being a limited liability company, attempts by Russo in 2021 to organize RP LAW LLC as a limited liability company under the laws of the State of Arizona were never completed; and a limited liability company organized by Russo under the laws of the State of Florida was voluntarily dissolved in 2022. Under Arizona, Florida, and Michigan law, a corporate officer is personally liable for debts of the entity incurred prior to incorporation or after dissolution of the entity.

6. Defendant MATTHEW A. DOLMAN, P.A. ("Dolman"), is a corporation organized and existing under the laws of the State of Florida, which does business sunder the fictitious name of DOLMAN LAW GROUP, with its principal office located at 800 North Belcher Road, Clearwater, Florida 33765-2103.

7. Defendant TORHOERMAN LAW LLC ("Torhoerman"), is a limited liability company organized and existing under the laws of the State of Illinois, with its principal office located at 210 South Main Street, Edwardsville, Illinois 62025-1922.

8. Defendant SADDLE ROCK LEGAL GROUP LLC ("Saddle Rock") is a limited liability company organized and existing under the laws of the State of Arizona, with its principal office located at 655 15th Street Northwest, Suite 800,

Washington, District of Columbia 20005-5705.

9. Defendant THOMAS LOWE YOUNG ("Young"), is an individual, of the age of majority, is mentally competent, is not in the military service, and resides at 3302 West Mullen Avenue, Tampa, Florida 33609-4658.

10. Defendant TYLER JOSEPH SCHNEIDER ("Schneider"), is an individual, of the age of majority, is mentally competent, is not in the military service, and resides at 3031 Sugar Shack Lane, Staunton, Illinois 62088-4213.

11. Defendant CONSUMER ENROLLMENTS CENTER ("CEC") is a fictitious name used by an unknown entity, the true identity of which is known to the other Defendants to this action but which is being concealed. Upon discovery of the true identity of CEC, Plaintiff will amend this Complaint to reflect said true identity.

### Jurisdiction

12. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

13. This Court has limited personal jurisdiction over Defendants Russo Firm, Dolman, Torhoerman, Saddle Rock, and CEC, pursuant to M.C.L. § 600.715, as a result of the defendants transacting any business within the state; and/or doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

4

14.   This Court has limited personal jurisdiction over Defendants Russo, Young, and Schneider, pursuant to M.C.L. § 600.705, as a result of the defendants transacting any business within the state; and/or doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

## Venue

15.   Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), as the tortious or illegal telephone calls complained of herein were received in this judicial district.

## Preliminary Statement

16.   As the Supreme Court recently explained, "Americans passionately disagree amount many things.   But they are largely united in their disdain for robocalls." *Barr v. American Association of Political Consultants LLC*, 140 S. Ct. 2335, 2343 (2020).

17.  The Federal Government receives a staggering number of complaints about robocalls – 3.7 million complaints in 2019 alone. *Id.*

18.  In response to widespread public outrage over intrusive telemarketing calls to homes and businesses, the United States Congress acted to prevent persons, like Defendant, from invading American citizen's privacy and to prevent abusive "robo-calls" by enacting the TCPA.

19.    According to the Federal Communications Commission ("FCC"), "Unwanted calls and texts are the number one complaint to the FCC."

20.    In regard to such telephone solicitations, Senator Hollings of South Carolina, the primary sponsor of the TCPA, explained, "computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall... these computerized telephone calls threaten our personal safety... These machines are out of control, and their use is growing by 30 percent every year. It is telephone terrorism, and it has got to stop...." See *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 17 FCC Rcd. 17459, 17474, fn. 90 (2002), quoting 137 Cong. Rec. 30,821-30,822 (Nov. 7, 1991).

21. According to YouMail, Inc., a company which tracks robocall activity and publishes the YouMail Robocall Index, during calendar year 2021 alone, American consumers were bombarded with over 50.5 *billion* robocalls; an average of over 150 robocalls to each man, woman, and child. [Source: www.robocallindex.com ].

22. In 2021, nearly 1 in 3 Americans say they have fallen victim to a phone scam in the past year, with reported losses to phone scams exceeding $29.8 Billion. [Source:   www.cndb.com/2021/06/29/americans-list-billions-of-dollars-to-phone-

scams-over-the-past-year.html ].

23. Congress has found that interstate telemarketing fraud has become a problem of such magnitude that the resources of the Government are not sufficient to ensure adequate consumer protection from such fraud.

24. As a result, in enacting the TCPA, Congress intentionally created a legally enforceable bounty system, not unlike *qui tam* statutes, to incentivize the assistance of aggrieved private citizens to act as "private attorneys general" in enforcing federal law.

## Telephone Consumer Protection Act

25. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and invasion of privacy to consumers specifically, but were also a threat to interstate commence generally. *See* S. Rep. No. 102-178, at 2-3, 1991 U.S.C.C.A.N. 1968, 1969-71, 1991 WL 211220 (1991).

26. The TCPA imposes restrictions on the use of automated telephone equipment. 47 U.S.C. § 227(b)(1).

27. Pursuant to authority delegated by Congress to the FCC under the TCPA at 47 U.S.C. § 227(b)(2), the FCC has adopted regulations to implement these requirements.

7

28. The TCPA implementing regulations, at 47 C.F.R. 64.1200(a), promulgate

in relevant part:

"No person or entity may: ...

(1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice; ...

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

(6) Disconnect an unanswered telemarketing call prior to at least 15 seconds or four (4) rings.

(7) Abandon more than three percent of all telemarketing calls that are answered live by a person, as measured over a 30–day period for a single calling campaign. If a single calling campaign exceeds a 30–day period, the abandonment rate shall be calculated separately for each successive 30–day period or portion thereof that such calling campaign continues. A call is "abandoned" if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting.

(I) Whenever a live sales representative is not available to speak with the person answering the call, within two (2) seconds after the called person's completed greeting, the telemarketer or the seller must provide:

(A) A prerecorded identification and opt-out message that is limited to disclosing that the call was for "telemarketing purposes" and states the name of the business, entity, or

8

individual on whose behalf the call was placed, and a telephone number for such business, entity, or individual that permits the called person to make a do-not-call request during regular business hours for the duration of the telemarketing campaign; provided, that, such telephone number may not be a 900 number or any other number for which charges exceed local or long distance transmission charges, and

(B) An automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make a do-not-call request prior to terminating the call, including brief explanatory instructions on how to use such mechanism. When the called person elects to opt-out using such mechanism, the mechanism must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call...

(iii) The seller or telemarketer must maintain records establishing compliance with paragraph (a)(7) of this section...."

29. The TCPA, at 47 U.S.C. 227(b)(3), provides for a private right of action,

as follows:

"Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State--

(A) an action based on a **violation of this subsection or the regulations prescribed under this subsection** to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages **for each such**

9

**violation**, whichever is greater, or

(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph."

30. Congress has also delegated authority under the TCPA to the FCC to implement regulations to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c)(1).

31. The TCPA regulations, at 47 C.F.R. 64.1200(d), further promulgate:

"No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes

10

(or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. . .

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made. . . ."

32. The TCPA regulations at, 47 C.F.R. § 64.1601(e), additionally promulgate

in relevant part:

> "Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(10) **must** transmit caller identification information.
>
> (1) For purposes of this paragraph, **caller identification information must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer**. It shall not be a violation of this paragraph to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller on behalf of which the telemarketing call is placed and the seller's customer service telephone number. **The telephone number so provided must permit any individual to make a do-not-call request during regular business hours.**
>
> (2) Any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information." [Emphasis added.]

33  The TCPA, at 47 U.S.C. § 227(c)(5), provides for a private right of action,

as follows:

> "Private right of action.  A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in **violation of the regulations prescribed under this subsection** may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State—
>
> (A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,
>
> (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages **for each**

**such violation**, whichever is greater, or

© both such actions.

It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph."

### Florida Telemarketing Sales Act

34. The FTSA, at Fla. Stat. 501.059, promulgates in relevant part:

"(2) Any telephone solicitor who makes an unsolicited telephonic sales call to a residential, mobile, or telephonic paging device telephone number shall identify himself or herself by his or her true first and last names and the business on whose behalf he or she is soliciting immediately upon making contact by telephone with the person who is the object of the telephone solicitation...

(5) A telephone solicitor or other person may not initiate an outbound telephone call, text message, or voicemail transmission to a consumer, business, or donor or potential donor who has previously communicated to the telephone solicitor or other person that he or she does not wish to receive an outbound telephone call, text message, or voicemail transmission:

(a) Made by or on behalf of the seller whose goods or services are being offered;...

(8)(a) A person may not make or knowingly allow a telephonic sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called without the prior express written consent of the called party.

(b) It shall be unlawful for any person who makes a telephonic sales call or causes a telephonic sales call to be made to fail to transmit or cause not to be transmitted the originating telephone number and, when made available by the telephone solicitor's carrier, the name of the telephone solicitor to any caller identification service in use by a recipient of a telephonic sales call. However, it is not a violation to substitute, for the name and telephone number used in or billed for making the call, the name of the seller on behalf of which a telephonic sales call is placed and the seller's customer service telephone number, which is answered during regular business hours. If a telephone number is made available through a caller identification service as a result of a telephonic sales call, the solicitor must ensure that telephone number is capable of receiving telephone calls and must connect the original call recipient, upon calling such number, to the telephone solicitor or to the seller on behalf of which a telephonic sales call was placed. For purposes of this section, the term "caller identification service" means a service that allows a telephone subscriber to have the telephone number and, where available, the name of the calling party transmitted contemporaneously with the telephone call and displayed on a device in or connected to the subscriber's telephone...

(d) There is a rebuttable presumption that a telephonic sales call made to any area code in this state is made to a Florida resident or to a person in this state at the time of the call...

14

(10)(a) A called party who is aggrieved by a violation of this section may bring an action to:

1. Enjoin such violation.

2. Recover actual damages or $500, whichever is greater.

(b) If the court finds that the defendant willfully or knowingly violated this section or rules adopted pursuant to this section, the court may, in its discretion, increase the amount of the award to an amount equal to not more than three times the amount available under paragraph (a)."

## General Allegations

35. Plaintiff's residential and cellular telephone lines have been besieged with telemarketing calls hawking such things as alarm systems, Google listings, automobile warranties, health insurance, life insurance, credit cards, and even financial miracles from God.  Some calls are blatant scams, including calls purportedly from the Social Security Administration, the U.S. Drug Enforcement Administration, and other government agencies, claiming that arrest warrants have been issued against Plaintiff for alleged drug trafficking and money laundering activities.

36. Plaintiff's residential telephone number is 321-***-0911.

37. Plaintiff's residential telephone number 321-***-0911 is a telephone number for which Plaintiff is charged on a per call and per minute basis.

38. Plaintiff has residences in Michigan and Florida.  Plaintiff's residential

15

telephone lines are arranged such that calls follow Plaintiff to the residence he is staying at.

39. The FCC has issued a declaratory ruling defining "called party" as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02–278, WC Docket No. 07–135, FCC 15–72, 2015 WL 4387780, at *26 ¶ 73 (FCC July 10, 2015).

40. Plaintiff is the subscriber to and a customary user of the called telephone lines, is the one that was the actual recipient of the telephone calls at issue in this complaint, and suffered the nuisance and invasion of privacy of same. Thus, Plaintiff has standing to bring this action for alleged violations of TCPA's robocall provisions. See *Leyse v. Bank of America Nat. Ass'n*, 804 F.3d 316, 324 (C.A.3, 2015).

41. At no time relevant hereto has Plaintiff or any other authorized person requested, consented, permitted, or authorized the contact from the Defendants.

42. At no time has Plaintiff provided permission to the Defendants to engage in telephone solicitation with the Plaintiff via telephone.

43. Pursuant to 47 U.S.C. § 217, the act, omission, or failure of any officer, agent, or other person acting for or employed by an common carrier or user, acting

within the scope of his employment, shall in every case also be deemed to be the act, omission, or failure of such carrier or user as well as that of the person.

44. Courts are legally bound to give great deference to the FCC's interpretations of the TCPA and its own regulations.

45. At no time has Plaintiff provided "prior express consent" or "prior express written consent" (as those terms are defined under the TCPA and as interpreted by the FCC) for any of the Defendants or anyone acting on behalf of the Defendants to initiate any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to Plaintiff's residential telephone number.

46. At no time has Plaintiff had an "established business relationship" (as that term is defined under the TCPA and as interpreted by the FCC) with any of the Defendants.

47. The FCC has declared that "[p]urporting to obtain consent during the call... does not constitute the *prior* consent necessary to deliver the message in the first place as the request... is part of the telemarketing." See *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14019, 2003 WL 21517853, at *49, ¶ 142 (June 26, 2003) [Emphasis as in original].

48. The FCC has clarified that sellers may be held vicariously liable for

violations of the TCPA by third-party telemarketers that initiate calls to market the

seller's products or services, declaring as follows:

> "[A] company on whose behalf a telephone solicitation is
> made bears the responsibility for any violation of our
> telemarketing rules and calls placed by a third party on
> behalf of that company are treated as if the company itself
> placed the call."

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act*

*of 1991*, Declaratory Ruling, 20 FCC Rcd. 13664, 13667, ¶ 7 (2005).

49. A seller may be liable for violations by its representatives under a broad

range of agency principles, including not only formal agency, but also principles of

apparent authority and ratification. *In re Dish Network,* 28 FCC Rcd. 6574, 6584, ¶

28 (2013).

50.  When considering individual corporate officer liability, other Courts have

agreed that a corporate officer involved in the telemarketing at issue may be

personally liable under the TCPA.  *See, e.g., Jackson Five Star Catering, Inc. v.*

*Beason,* No. 10-10010, 2013 U.S. Dist. LEXIS 155985, *10 (E.D. Mich. Nov. 8,

2013) ("[M]any courts have held that corporate actors can be individually liable for

violating the TCPA where they had direct, personal participating in or personally

authorized the conduct found to have violated the statute.") (internal citation

omitted); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D.MD.

2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

51. It is well settled under Michigan law that corporate employees and officials are personally liable for all tortious and criminal acts in which they participate, regardless of whether they are acting on their own behalf or on behalf of a corporation.  A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent for the corporation and not on his own behalf.

52.  Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words or may be implied and understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in concert, each become subject to liability for the acts of the others, as well as for his own acts. In either case, the defendant's embrace of the actor's purpose or design—whether by agreement or by action—renders the defendant liable for the underlying tort.

53.  The liability of coconspirators to civil damages is joint and several. All those who, in pursuance of a common plan to commit a tortious act actively take part in it and further it by cooperation or request, or who lend aid or encouragement to the

wrongdoer, or who ratify and adopt the acts done for their benefit, are equally liable with him.

54. For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of invasion of privacy and intrusion on Plaintiff's right of seclusion.

55. For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of the occupation of the telephone line by unwelcome calls, making the phone unavailable for legitimate callers or outgoing calls, including emergency calls, when the telephone line was seized by Defendant's calls.

56. For each and every call alleged herein initiated to Plaintiff's telephone line, Defendants caused an injury in the form of a nuisance and annoyance to the Plaintiff. For calls that were answered, Plaintiff had to go to the unnecessary trouble of answering them. Even for unanswered calls, Plaintiff had to deal with missed call notifications and call logs that reflected the unwanted calls. This also impaired the usefulness of these features on Plaintiff's telephone, which features are designed to inform the user of important missed communications.

57. Each and every call placed without consent by Defendants alleged herein to Plaintiff's telephone lines resulted in the injury of a trespass to Plaintiff's chattel, namely Plaintiff's telephone line and its telephone services.

58. For purposes of the TCPA, the FCC has defined "willfully or knowingly" to mean that the violator knew that he was doing the act in question, in this case, initiating a telephone solicitation, irrespective of any intent to violate the law. A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance.

## The Concert of Action

59. An estimated one million people who were stationed at Camp Lejeune in North Carolina from 1953 to 1987 may have been exposed to contaminated drinking water that can cause cancer, birth defects, miscarriages, and other serious health problems and are now eligible to be part of the Camp Lejeune water contamination lawsuit and entitled to compensation for any injuries, illnesses, diseases, and health conditions allegedly caused by the contaminated water.

60. In response to the mass tort multi-district litigation matter involving toxic exposure, numerous entities, including Defendants, are engaging in mass telemarketing and robocalling campaigns to broad swathes of the United States, in apparent disregard of the TCPA.

61. Defendants are engaged in soliciting members of the public to be represented by Defendants in filing claims and lawsuits and other matters arising out of and suffered by individuals related to Camp Lejeune or other military toxic

exposure.

62.  Russo Firm and Torhoerman appear to be taking the lead and partnering with other law firms and lawyers to engage in providing representation to consumers injured by toxic water at Camp Lejeune.

63.  Defendant Russo is an attorney-at-law that is a principal and officer of Russo Firm who is leading the Camp Lejeune water contamination lawsuit consumer marketing at Russo Firm, and in partnership with other named Defendants, including RP Law LLC, and Dolman.

64.  Defendant Schneider is an attorney-at-law that is employed by TorHoerman who is leading the Camp Lejeune water contamination lawsuit consumer marketing at TorHoerman, and in partnership with other named Defendants, including TorHoerman.

65.  Defendant Young is an attorney-at-law that is employed by Saddle Rock who is leading the Camp Lejeune water contamination lawsuit consumer marketing at Saddle Rock, and in partnership with other named Defendants, including TorHoerman.

66.  In general, lawyers are prohibited from soliciting clients in person, on the telephone, and through real-time electronic communication, unless the person the are talk to is: a lawyer, a family member, close friend, or prior business associate; or

someone who routinely uses similar legal services for their business. American Bar Association ("ABA") Model Rules Prof. Conduct 7.3.

67. Defendants utilize third-party telemarketers to initiate telephone calls *en masse* using automated telephone dialing systems, which have the capacity to store or produce telephone numbers to be called using a random or sequential number generator to dial such numbers, to solicit consumers to utilize Defendants' legal services.

68. Defendants approved the contracts with and pay the third-party telemarketers to engage in the illegal telephone solicitations.

69. The third-party telemarketers will call and query consumers to determine if they meet the pre-qualification criteria set by Defendants to be a suitable plaintiff in the Camp Lejeune water contamination cases.

70. If, at any point in the telephone solicitation, the called consumer fails to meet the designated pre-qualification criteria, the third-party telemarketer will immediately terminate the call – usually very impolitely – and move on to initiating another call to another consumer.

71. If the called consumer meets the pre-qualification criteria, the third-party telemarketer will usually then transfer the call to a "verifier" to make a second review of the pre-qualification criteria with the consumer.

72.  Once the consumer has been pre-qualified and verified, the consumer is informed that the call is being transferred to an "attorney", at which point the call is transferred to an agent who will further discuss legal representation of the consumer and seek to have the consumer to agree to legal representation in the Camp Lejeune mass tort litigation.

73.  A representation agreement is then sent to the consumer, either via text mail, electronic mail, or courier for the consumer to sign to retain the defendant law firm.

74.  It is only at the stage where the representation agreement is provided to the consumer that the consumer is able to determine the names of the attorneys or law firm.

75.  Defendants instruct their third-party telemarketers to identify with generic references to "Camp Lejeune" and not identify with any identifiable business name in order to conceal their true identity and evade liability for, *inter alia*, TCPA violations.

76.  When Plaintiff has sought better identification from the third-party telemarketer, the telemarketer will avoid providing any information and/or will hang up.  This is obviously done  because the Defendants and their third-party telemarketers all know that the entire concert of action which they are engaged in is

illegal.

77.  In those instances where Plaintiff has made a "do-not-call" demand to the third-party telemarketer, the telemarketer will typically utter profanities at Plaintiff and hang up.

78.  To further conceal identities, the third-party telemarketer will falsify or "spoof" their caller identification number information such that the called party is unable to call the third-party telemarketer back to, *inter alia*, ascertain their identity or to make a "do not call" demand.

79.  Defendants are all fully cognizant of the illegal nature of the telephone solicitations and the illegal activities of their third-party telemarketers, but engage in willful blindness to the illegal telemarketing activities of their telemarketing agents because doing so benefits them financially when they generate new clients through illegal telemarketing.

80.  When Plaintiff has called the Defendant law firms directly inquiring about the Camp Lejeune solicitation calls, Plaintiff has been met with denials that the law firms are seeking Camp Lejeune clients via telemarketing; that leads come in from online inquiries submitted over the Internet.

81.  The third-party telemarketers have actual authority or apparent authority from the Defendants to solicit consumers for representation by the Defendants.

82. Defendants personally authorized, directed, had control over, participated, and ratified the telephone solicitation activities by accepting the representation agreements which are produced as a result.

83. Defendants derive substantial financial benefits from the telephone solicitations and the resultant representation agreements.

84. Because the telemarketers engaged in illegal telephone solicitations utilize deceptive practices designed to conceal their actual identities, and the defendant law firms have refused to identify their third-party telemarketers, Plaintiff has had to resort to various investigative techniques to identify the sources of the telemarketing calls being received.

85. One investigative technique utilized by Plaintiff is termed a "canary trap", wherein Plaintiff provides false, but unique, identifying information during each received call, in particular a unique name. The unique information supplied acts like a fingerprint. If and when that unique information surfaces at a later date, a tie-in between the two events, and hence the ability to identify the source call, is able to be made.

86. To date, the identities of the third-party telemarketers utilized by the Defendants remain unknown to Plaintiff, however Plaintiff has been able to ascertain he email address of one such third-party telemarketer as being

consumerenrollments.org, and the same entity displayed caller identification name information on calls as CONSUMER ENROLL.

87.  As discovery progresses in this case and Plaintiff is able to learn the true identity or identities of the third-party telemarketers centers that Defendants have utilized to initiate the telephone solicitations, Plaintiff will seek to amend this complaint to add the third-party telemarketers as additional named defendants.

88.  Also as discovery progresses in this case, Plaintiff anticipates learning of additional telephone solicitation calls for which Defendants or Defendants' third-party telemarketers are responsible, at which time Plaintiff will seek to amend this complaint to supplement the damages claims.

89.  Prior to August 16, 2023, Plaintiff has received dozens of telephone solicitation calls to his residential telephone line 321-***-0911 wherein the caller is attempting to ascertain whether Plaintiff or "any loved ones" have worked or served at Camp Lejeune between 1953 and 1987.  Plaintiff has repeatedly made do not call demands to the calling parties.  Despite the repeated do not call demands, the Camp Lejeune telephone solicitations continue.

### Call 1

90.  On August 16, 2023, at approximately 10:48 A.M., Defendants or Defendants' agent initiated a telephone solicitation call to Plaintiff's residential

telephone number 321-***-0911.

91. The caller identification number displayed was 321-221-5525, and the caller identification name displayed was WINTER GDN FL.

92. Upon answering the telephone call by saying "hello", Plaintiff heard a "boink" sound, which is indicative of an automatic telephone dialing system being used, followed by a 2-3 second delay, then a male individual began speaking and identified himself as "Michael... with Injury Claims Services... on a recorded line."

93. Michael then inquired if "you or anyone else in your family ever served at Camp Lejeune." To better identify the caller, Plaintiff stated "yes."

94. Michael then began to seek detailed information from Plaintiff, including name, date of birth, address, and Social Security number. Plaintiff engaged Michael in a "canary trap" by providing controlled information including the *faux* name of Lester Clarke.

95. Michael then stated that Plaintiff's telephone number "shows on the do not call list" and inquired if Plaintiff had an alternate telephone number, to which Plaintiff responded that he did not.

96. The call was then live transferred to a female telemarketer who identified herself as "Tony... with the Camp Lejeune Compensation Center."

97. Tony then asked the same pre-qualifying questions of Plaintiff as had been

asked by Michael.

98.   Tony then sent Plaintiff an email addressed to Lester Clarke at the controlled email address which Plaintiff had provided to her which email was from "Consumer Enrollments Center  info@consumerenrollments.org", and attached to which was a contingency fee retainer agreement on Russo Firm letterhead, which agreement was pre-filled with the controlled identifying information on Lester Clarke which Plaintiff had provided, and which Russo Firm, RP Law LLC, and Dolman were the partner law firms providing representation.

99.   Tony was attempting to get Plaintiff to electronically sign the retainer agreement.

100.  Plaintiff asked Tony what company she worked for and where she was located; she immediately hung up.

101.  Immediately after the termination of the call, Plaintiff dialed the caller identification number displayed (321-221-5525) and received a reorder signal. Plaintiff further observed that if he dialed the caller identification number from a telephone that was registered on the National Do Not Call Registry ("NDNCR"), the call would immediately go to a reorder signal; but, if he dialing from a telephone that was not on the NDNCR, the call would ring 5 times and then go to a busy signal. This is a further characteristic of an automatic telephone dialing system being used.

### Call 2

102. On August 16, 2023, at approximately 11:40 A.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

103. The caller identification number displayed was 619-586-6076, and the caller identification name displayed was CONSUMER ENROLL.

104. Upon answering the call by saying "hello", Plaintiff heard a female state "Hi, can I speak to Lester? This is Tony from the Enrollment Center." (The same Tony as in Call 1). Tony then asked if Plaintiff was familiar with the Camp Lejeune compensation claim. Plaintiff then inquired "Didn't I just talk to you?. Tony then stated that the contract was already sent out to Plaintiff and to tell any future callers that Plaintiff had already signed up and then hung up.

### Call 3

105. On August 16, 2023, at approximately 11:41 A.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

106. The caller identification number displayed was 866-552-6086, and the caller identification name displayed was CONSUMER ENROLL.

107. Upon answering the call, Plaintiff was hung up upon.

## Call 4

108.   On August 16, 2023, at approximately 11:42 A.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

109.  The caller identification number displayed was 866-522-6086, and the caller identification name displayed was CONSUMER ENROLL.

110.  Upon answering the call, Plaintiff was hung up upon.  The duration of the call from initiation to termination was 8 seconds.

## Call 5

111.   On August 16, 2023, at approximately 2:43 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

112.  The caller identification number displayed was 619-586-6076, and the caller identification name displayed was CONSUMER ENROLL.

113.  Upon answering the call by saying "hello", Plaintiff heard a female state "Can I speak to Lester, please?  This is Tony from the Enrollment Center and I am calling regarding the Camp Lejeune compensation claim.  (The same Tony  as in Calls 1 and 2).  Plaintiff told Tony that he had already signed up and hung up.

## Call 6

114.   On August 16, 2023, at approximately 3:38 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

115.  The caller identification number displayed was 866-552-6086, and the caller identification name displayed was CONSUMER ENROLL.

116.  Upon answering the call, Plaintiff was hung up upon.

## Call 7

117.   On August 17, 2023, at approximately 10:33 A.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

118.  The caller identification number displayed was 619-586-6076, and the caller identification name displayed was CONSUMER ENROLL.

119.  Upon answering the call by saying "hello", Plaintiff heard approximately 3 seconds of silence before a male began to speak saying "May I speak to Lester, please" and then identified himself as "James... with the Enrollment Center." James confirmed that Plaintiff "had done the intake yesterday with Tony with the law firm Russo Dolman." Plaintiff asked James for his surname, but indicated that he is not allowed to give out his last name. Plaintiff asked for his company address, to which

he responded that "I don't think I can give you that as well." James indicated that there are like a concierge or receptionist for the attorneys and cannot give out any information.

### Call 8

120.   On August 17, 2023, at approximately 5:33 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

121.  The caller identification number displayed was 619-586-6076, and the caller identification name displayed was CONSUMER ENROLL.

122. Upon answering the call, Plaintiff was hung up upon.  The duration of the call from initiation to termination was 11 seconds.

### Call 9

123.   On August 18, 2023, at approximately 5:51 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

124.  The caller identification number displayed was 619-586-6076, and the caller identification name displayed was CONSUMER ENROLL.

125.  Upon answering the call, Plaintiff was hung up upon.

**Call 10**

126.   On August 21, 2023, at approximately 1:43 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

127.  The caller identification number displayed was 619-586-6076, and the caller identification name displayed was CONSUMER ENROLL.

128.  Upon answering the call, Plaintiff was hung up upon.

**Call 11**

129.   On August 22, 2023, at approximately 11:49 A.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

130.  The caller identification number displayed was 619-586-6076, and the caller identification name displayed was CONSUMER ENROLL.

131.  Upon answering the call, Plaintiff was hung up upon.

**Call 12**

132.   On August 23, 2023, at approximately 10:13 A.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

133.  The caller identification number displayed was 619-586-6076, and the

caller identification name displayed was CONSUMER ENROLL.

134.  Upon answering the call, a female asked "May I speak with Lester?" and then identified herself as "Tony... with the Enrollment Center." (The same Tony as in Calls 1, 4, and 5). Tony inquired whether Plaintiff had ever been at Camp Lejeune, to which Plaintiff responded "yes."  Tony then went through a pre-qualification process.

135.  Tony then sent Plaintiff an email addressed to Lester Clarke at the controlled email address which Plaintiff had provided to her which email was from "Consumer Enrollments Center  info@consumerenrollments.org", and attached to which was a contingency fee retainer agreement on TorHoerman and Saddle Road letterhead, which agreement was pre-filled with the controlled identifying information on Lester Clarke which Plaintiff had provided, and which TorHoerman and Saddle Road were the partner law firms providing representation, and which Young had signed an introductory letter on behalf of Saddle Rock, and which Schneider had signed an introductory letter on behalf of TorHoerman.

136.  Tony was attempting to get Plaintiff to electronically sign the retainer agreement.

### Call 13

137.  On August 23, 2023, at approximately 1:25 P.M., Defendants or

35

Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

138.  The caller identification number displayed was 619-586-6076, and the caller identification name displayed was CONSUMER ENROLL.

139.  Upon answering the call, Plaintiff was hung up upon.

### Call 14

140.   On August 23, 2023, at approximately 3:27 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

141.  The caller identification number displayed was 619-586-6076, and the caller identification name displayed was CONSUMER ENROLL.

142.  Upon answering the call, Plaintiff was hung up upon.  The duration of the call from initiation to termination was 6 seconds.

### Call 15

143.   On August 24, 2023, at approximately 10:39 A.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

144.  The caller identification number displayed was 619-586-6076, and the caller identification name displayed was CONSUMER ENROLL.

145.  Upon answering the call, Plaintiff was hung up upon.

## Call 16

146.   On August 29, 2023, at approximately 5:24 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

147.  The caller identification number displayed was 866-552-6086, and the caller identification name displayed was CONSUMER ENROLL.

148.  Upon answering the call, Plaintiff was hung up upon.

## Call 17

149.   On August 29, 2023, at approximately 5:25 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

150.  The caller identification number displayed was 866-552-6086, and the caller identification name displayed was CONSUMER ENROLL.

151.  Upon answering the call, Plaintiff was hung up upon.

## Call 18

152.   On August 29, 2023, at approximately 5:33 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's residential telephone line 321-***-0911.

153.  The caller identification number displayed was 866-552-6086, and the caller identification name displayed was CONSUMER ENROLL.

154.  Upon answering the call, Plaintiff was hung up upon. The duration of the call from initiation to termination was 11 seconds.

### Subsequent Investigation

155.  On several occasions, Plaintiff initiated calls to the caller identification numbers display during Calls 1 through 18, *supra*, those numbers being 321-221-5525, 619-586-6076, and 866-552-6086, in order to make do-not-call demands to the callers.  On those occasions where Plaintiff's call was answered, when Plaintiff requested to have his telephone number placed on their do-not-call list, the person answering refused to take the information and immediately hang up.

### COUNT I
### VIOLATION OF THE TCPA - AUTODIALER CALL

156.  Plaintiff incorporates the allegations of paragraphs 1 through 155, *supra.*

157.  Each of Calls 1 through 18, *supra*, were in violation of the TCPA regulations, specifically 47 C.F.R. 64.1200(a)(1)(iii), as Defendants or Defendants' agent initiated a telephone call to a telephone line for which the called party is charged for the call using an automatic dialing system without the prior express consent of the called party and there being no emergency.

158.  The aforesaid violations of the TCPA were willful and/or knowing as is

evidenced by the caller's admission during Call 1 that the telephone number is on the do not call list and the repetitive number of calls.

## COUNT II
## VIOLATION OF THE TCPA - HANG-UP CALL

159. Plaintiff incorporates the allegations of paragraphs 1 through 155, *supra.*

160. Each of Calls 4, 8, 14, and 18, *supra*, were in violation of the TCPA regulations, specifically 47 C.F.R. § 64.1200(a)(6), as Defendants or Defendants' agent disconnected an unanswered telemarketing call prior to at least 15 seconds or four (4) rings.

161. The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT III
## VIOLATION OF THE TCPA - ABANDONED CALL

162. Plaintiff incorporates the allegations of paragraphs 1 through 155, *supra.*

163. Each of Calls 3, 4, 5, 6, 8 through 11, and 13 through 18, *supra*, were in violation of the TCPA regulations, specifically 47 C.F.R. § 64.1200(a)(7)(I), as Defendants or Defendants' agent initiated a telephone call to Plaintiff's telephone line and a live sales representative was not available and did not speak to Plaintiff within two (2) seconds after the called person's completed greeting.

164. The aforesaid violations of the TCPA were wilful and/or knowing as is

evidenced by the repeated number of calls.

## COUNT IV
## VIOLATION OF THE TCPA - DO NOT CALL

165.  Plaintiff incorporates the allegations of paragraphs 1 through155, *supra*.

166.  Each of Calls 1 through 18, *supra*, were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(d)(3), as Defendants or Defendants' agent initiated a telephone solicitation to a residential telephone subscriber who had previously made a do-not-call request.

167.  The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls, as well as the telephone call where the telemarketer admitting that Plaintiff's telephone number was on the do-not-call list.

## COUNT V
## VIOLATION OF THE TCPA - FAILURE TO IDENTITY

168.  Plaintiff incorporates the allegations of paragraphs 1 through 155, *supra*.

169.  Each of Calls 1 through 18 *supra*, were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(d)(4), as Defendants or Defendants' agent entity making the call for telemarketing purposes did provide not the called party with the name of the individual caller, and/or the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.  Where an entity name was provided,

it was a false name and not the name of the entity on whose behalf the call is being made.

170.  The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT VI
## VIOLATION OF THE TCPA - SPOOFED CALLER ID

171.  Plaintiff incorporates the allegations of paragraphs 1 through 155, *supra.*

172.  Each of the Calls 1 through 18, *supra*, were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1601(e)(1), as Defendants and/or Defendants' agents failed to provide caller identification information displaying a telephone number which would permit any individual to make a do-not-call request during regular business hours.

173.  The fact that Defendants or Defendants' agents would hang up when do-not-call requests were being made evidences that the aforesaid violation of the TCPA was wilful and/or knowing.

## COUNT VII
## VIOLATION OF THE FTSA

174.  Plaintiff incorporates the allegations of paragraphs 1 through 155, *supra.*

175.  Each of Calls 1 through 18, *supra*, were in violation of the FTSA: specifically Fla. Stat. § 501.059(2), as Defendants or Defendants' agent made an

unsolicited telephonic sales call to a residential telephone number and did not identify himself by his or her true first and last names and the business immediately upon making contact by telephone with the person who is the object of the telephone solicitation; and/or Fla. Stat. § 501.059(5), Defendants or Defendants' agent made an outbound telephone call to a consumer who had previously communicated to the telephone solicitor or other person that he or she does not wish to receive an outbound telephone call.

## PRAYER FOR RELIEF

WHEREFORE, the aforesaid premises considered, Plaintiff prays that this Court enter a judgment for Plaintiff and against the Defendants, jointly and severally, as follows:

A.    Damages:

I.    Damages for violations of the TCPA alleged:

| Count | Violations |
|-------|-----------|
| I | 18 |
| II | 4 |
| III | 14 |
| IV | 18 |
| V | 18 |
| VI | 18 |

A total of 90 violations at $500 per violation

for damages of $45,000.00, which amount

42

shall be trebled because the violations were willful and/or knowing, for total damages of $135,000.00.

ii. Damages for violations of the FTSA alleged at Count VII: 18 violations at $500 per violation, for damages of $9,000.00, which amount shall be trebled because the violations were willful and/or knowing, for total damages of $27,000.00.

The cumulative total amount of damages claimed in this action is $162,000.00, and in the event of default judgment is the sum certain damages amount that will be sought.

B. An award of Plaintiff's taxable costs and disbursements incurred in the filing and prosecution of this action;

C. An injunction enjoining Defendants from initiating any telephone calls to Plaintiff's residential telephone and cellular telephone lines.

D. Interest accruing from the date of filing until paid at the statutory rate; and,

E. Such other and further relief as this Court deems necessary, reasonable, prudent and proper under the circumstances.

Respectfully submitted,

Dated: September 5, 2023

_____

Mark W. Dobronski
Post Office Box 222
Dexter, Michigan 48130-0222
Telephone: (734) 330-9671
Email: markdobronski@yahoo.com
Plaintiff *In Propria Persona*

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MARK W. DOBRONSKI | ANTHONY J. RUSSO, JR. P.A.; ANTHONY JOHN RUSSO, JR.; MATTHEW A. DOLMAN, P.C.; TORHOERMAN LAW LLC; et al. |
| **(b)** County of Residence of First Listed Plaintiff    Orange, FL <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant    Palm Beach, FL <br> *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* <br> PRO SE | Case: 2:23-cv-12288 <br> Assigned To : Cox, Sean F. <br> Referral Judge: Altman, Kimberly G. <br> Assign. Date : 9/7/2023 12:08 PM <br> Description: CMP DOBRONSKI V. RUSSO ET AL (DA) |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance <br> [ ] 120 Marine <br> [ ] 130 Miller Act <br> [ ] 140 Negotiable Instrument <br> [ ] 150 Recovery of Overpayment & Enforcement of Judgment <br> [ ] 151 Medicare Act <br> [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) <br> [ ] 153 Recovery of Overpayment of Veteran's Benefits <br> [ ] 160 Stockholders' Suits <br> [ ] 190 Other Contract <br> [ ] 195 Contract Product Liability <br> [ ] 196 Franchise | **PERSONAL INJURY** <br> [ ] 310 Airplane <br> [ ] 315 Airplane Product Liability <br> [ ] 320 Assault, Libel & Slander <br> [ ] 330 Federal Employers' Liability <br> [ ] 340 Marine <br> [ ] 345 Marine Product Liability <br> [ ] 350 Motor Vehicle <br> [ ] 355 Motor Vehicle Product Liability <br> [ ] 360 Other Personal Injury <br> [ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY** <br> [ ] 365 Personal Injury - Product Liability <br> [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability <br> [ ] 368 Asbestos Personal Injury Product Liability <br> **PERSONAL PROPERTY** <br> [ ] 370 Other Fraud <br> [ ] 371 Truth in Lending <br> [ ] 380 Other Personal Property Damage <br> [ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 <br> [ ] 690 Other | [ ] 422 Appeal 28 USC 158 <br> [ ] 423 Withdrawal 28 USC 157 <br> **PROPERTY RIGHTS** <br> [ ] 820 Copyrights <br> [ ] 830 Patent <br> [ ] 835 Patent - Abbreviated New Drug Application <br> [ ] 840 Trademark <br> [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act <br> [ ] 376 Qui Tam (31 USC 3729(a)) <br> [ ] 400 State Reapportionment <br> [ ] 410 Antitrust <br> [ ] 430 Banks and Banking <br> [ ] 450 Commerce <br> [ ] 460 Deportation <br> [ ] 470 Racketeer Influenced and Corrupt Organizations <br> [ ] 480 Consumer Credit (15 USC 1681 or 1692) <br> [X] 485 Telephone Consumer Protection Act <br> [ ] 490 Cable/Sat TV <br> [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** <br> [ ] 210 Land Condemnation <br> [ ] 220 Foreclosure <br> [ ] 230 Rent Lease & Ejectment <br> [ ] 240 Torts to Land <br> [ ] 245 Tort Product Liability <br> [ ] 290 All Other Real Property | **CIVIL RIGHTS** <br> [ ] 440 Other Civil Rights <br> [ ] 441 Voting <br> [ ] 442 Employment <br> [ ] 443 Housing/ Accommodations <br> [ ] 445 Amer. w/Disabilities - Employment <br> [ ] 446 Amer. w/Disabilities - Other <br> [ ] 448 Education | **PRISONER PETITIONS** <br> **Habeas Corpus:** <br> [ ] 463 Alien Detainee <br> [ ] 510 Motions to Vacate Sentence <br> [ ] 530 General <br> [ ] 535 Death Penalty <br> **Other:** <br> [ ] 540 Mandamus & Other <br> [ ] 550 Civil Rights <br> [ ] 555 Prison Condition <br> [ ] 560 Civil Detainee - Conditions of Confinement | **LABOR** <br> [ ] 710 Fair Labor Standards Act <br> [ ] 720 Labor/Management Relations <br> [ ] 740 Railway Labor Act <br> [ ] 751 Family and Medical Leave Act <br> [ ] 790 Other Labor Litigation <br> [ ] 791 Employee Retirement Income Security Act <br> **IMMIGRATION** <br> [ ] 462 Naturalization Application <br> [ ] 465 Other Immigration Actions | **SOCIAL SECURITY** <br> [ ] 861 HIA (1395ff) <br> [ ] 862 Black Lung (923) <br> [ ] 863 DIWC/DIWW (405(g)) <br> [ ] 864 SSID Title XVI <br> [ ] 865 RSI (405(g)) <br> **FEDERAL TAX SUITS** <br> [ ] 870 Taxes (U.S. Plaintiff or Defendant) <br> [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 890 Other Statutory Actions <br> [ ] 891 Agricultural Acts <br> [ ] 893 Environmental Matters <br> [ ] 895 Freedom of Information Act <br> [ ] 896 Arbitration <br> [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision <br> [ ] 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
47 U.S.C. 227

Brief description of cause:
Illegal telephone solicitation calls

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 162,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [X] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE    September 5, 2023

SIGNATURE OF ATTORNEY OF RECORD    *Mark W. Dobronski*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?      ☐ Yes
                                                                                              ■ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.        Other than stated above, are there any pending or previously
        discontinued or dismissed companion cases in this or any other  ☐ Yes
        court, including state court? (Companion cases are matters in which ■ No
        it appears substantially similar evidence will be offered or the same
        or related parties are present and the cases arise out of the same
        transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes :

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

UNITED STATES
POSTAL SERVICE

**PRIORITY**
**MAIL**

PRIORITY MAIL®

U.S. MARSHALS

**UNITED STATES POSTAL SERVICE**

Retail

US POSTAGE PAID
**$9.65**

Origin: 48130
09/05/23
2525100130-05

0 Lb 13.30 Oz

RDC 01

C052

EXPECTED DELIVERY DAY: 09/06/23

SHIP
TO:
231 W LAFAYETTE BLVD
FL 5TH
DETROIT MI 48226-2777

USPS TRACKING® #

9505 5123 0483 3248 5582 75

FROM:

MARK W DOBRONSKI
PO BOX 222
DEXTER, MI 48130-0222

TO:

UNITED STATES DISTRICT COURT
ATTN: CLERK'S OFFICE
231 W LAFAYETTE BLVD FL 5
DETROIT, MI 48226-2700

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP